**In re KENTUCKY TRUCK SALES, INC., Debtor.**

**Bankruptcy No. 3–85–00567(D).**

United States Bankruptcy Court, W.D. Kentucky.

Sept. 6, 1985.

Wallace H. Spalding, III, W. Kevin Smith, Louisville, Ky., for debtor.

Ralph H. Logan, Louisville, Ky., for Local 89.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

In this case of first impression we apply the so-called "Bildisco amendments" to the Bankruptcy Code[1] in order to determine whether to allow a corporation in Chapter 11 to reject a collective bargaining agreement. The question has been the subject of a day-long evidentiary hearing and thorough briefing by counsel. Sensitive to the fact that our determination requires a highly judgmental balancing of bankruptcy law and national labor policy, we will begin with the factual background of the dispute.

## BACKGROUND

The debtor, Kentucky Truck Sales, Inc., has been in operation since 1968. It is engaged in the business of selling, servicing and leasing of trucks. It is an authorized dealer of Volvo-White Motor Company, Freightliner Corporation, Iveco Trucks of America, Inc. and Volvo Diesel Trucks. The debtor's main office is located in Louisville, Kentucky. From 1982 to 1984 the debtor maintained a branch office in Lexington, Kentucky. In early 1984 the principal stockholder of the debtor, William McGuirk, purchased the Lexington branch and incorporated it as a separate entity.[2]

Through the 1980's the debtor has been experiencing severe financial problems due in part to poor cost controls and a general

---

1. On February 22, 1984, the United States Supreme Court handed down its decision in the case of *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). This opinion touched off an intense lobbying effort by organized labor to have Congress amend the Bankruptcy Code and, in effect, "overrule" *Bildisco.* These efforts finally resulted in the passage of § 1113 of the Bankruptcy Code in the 1984 Amendments Act. For a detailed analysis of the legislative process leading to enactment, see *Rosenberg,* "Bankruptcy and the Collective Bargaining Agreement—a Brief Lesson in the Use of the Constitutional System of Checks and Balances," 58 Am.Bankr.L.J. 293 (Fall 1984).

2. McGuirk purchased the Lexington branch operation for $200,000 in cash plus an agreement to turn over to the debtor the Lexington operations profits 1984 profits and reimburse the debtor for all expenses incurred by it for the Lexington operation in fiscal year 1984.

decline in the truck business. During this time the debtor entered into negotiations with the General Drivers Warehousemen and Helpers Union, Local No. 89, for various changes in their labor contract. Some of these negotiations predate the debtor's present labor agreement, which took effect in August, 1983, and runs through August, 1986. The union granted the debtor several concessions as a result of these talks and the debtor made other changes in its operations in an effort to stave off bankruptcy.[3] These efforts ultimately failed and on March 18, 1985, the debtor filed for relief under Chapter 11 of the U.S. Bankruptcy Code.

The debtor's present economic condition is precarious, but not beyond salvage. The debtor's most recent balance sheet shows assets of $1,434,676 and liabilities of $1,125,156. However, in the past two fiscal years the debtor has lost approximately $100,000 and in nine months of its present fiscal year the debtor has lost over $60,-000.[4] For the last six months the debtor has failed to make the payments required by its labor agreement to the Central States, Southeast and Southwest Areas Health and Welfare Fund (Health & Welfare Fund) for its union employee's health insurance coverage.[5] Further, the debtor's trade accounts payable have increased over the past two fiscal years from $292,557 in 1983 to $528,415 in 1984.

Since the commencement of this Chapter 11 proceeding the debtor and the union have met several times to attempt to modify the present labor agreement. The first meeting was held on April 26, 1985. At that meeting the debtor set forth the basic framework of the concessions he needed to continue in operation. The debtor's proposal came about as a result of an intensive review of the debtor's operations by an outside consultant, Pat Michell, a certified public accountant. Mr. Mitchell's analysis indicated that in order for the debtor to continue in operation as a viable business, it would be required to reduce operating costs in its parts and service department by approximately $100,000 per year. Mr. Mitchell's recommendation was based on the fact that not only was the debtor losing $60,000 to $75,000 per year, but that in order to continue to be properly supplied with parts and inventory the debtor would have to begin to reduce its trade accounts payable. According to Mr. Mitchell, the debtor has already made nearly all possible cost cuts in the nonlabor areas of its operation. The only remaining area in which significant savings can be made, according to Mr. Mitchell, is in labor cost.

Specifically the debtor's April proposal called for: (1) the workers to take approximately a 10–12% reduction in salary;[6] (2) the company to change the worker's health insurance coverage from the Health & Welfare Fund to HumanaCare Plus; (3) restricting paid vacation time to two weeks; (4) the elimination of one paid holiday; and (5) no increase in the debtor's contribution

---

**3.** Prior to filing its Chapter 11 petition, the debtor changed its non-union employee's healthcare insurance from Blue Cross-Blue Shield to HumanaCare Plus; froze managerial and clerical salaries (the freeze had been in effect for the previous 5 years unofficially); reduced "floor plan" financing costs by 50%; and instituted a program to restrict utility bills. Further, Mr. McGuirk testified that he would retire from the debtor corporation as part of a reorganization effort if the union would agree to certain concessions. This action would save the debtor nearly $50,000 in administrative salary costs.

**4.** This loss has continued in spite of the fact that the debtor had failed to make his required payments to the Health & Welfare fund and had implemented most of the cost saving measures described in the preceding paragraph.

**5.** This action by the company appears to be a technical breach of the collective bargaining agreement and of section 1113(f) of the U.S. Bankruptcy Code. *See In re Fiber Glass Industries, Inc.,* 49 B.R. 202, 206 n. 6 (Bkrtcy.N.D.N.Y. 1985). But the breach was caused by the simple fact of inability to pay, the same reason that brings the debtor to this court. This technical violation of section 1113(f) has no bearing on our consideration of the debtor's application to reject the collective bargaining agreement.

**6.** Initially the debtor proposed a 10% cut in union wages, later the demand was changed to a 12% cut. In evaluating the fairness of the debtor's proposal we will look at the 12% wage reduction demand.

to the Union's pension fund. According to Mr. Mitchell, these changes in the labor contract would result in savings of approximately $100,000 per year in the debtor's fixed overhead costs.[7] The union considered and later rejected the debtor's proposal. The two sides met again on May 28 in an attempt to reach a settlement. At that time the debtor's proposal was again discussed at length. The union's representatives took the proposal to the union's president for a decision. The next day the debtor was informed that the union would not agree to the proposed changes. No reason was given at that time for the union's rejection of the requested concessions.

After the union rejected the debtor's proposed modifications the debtor filed a motion under section 1113 of the Bankruptcy Code to reject its labor contract with the union, the debtor's president met briefly on July 1 with an agent of the union in an attempt to work out their differences. In that meeting the union stated that they would not agree to any change in either the health or pension benefits. At this meeting, as at the previous two meetings, the union did not make a concrete counter-offer to the debtor.

The most recent and final negotiations between the company and the union were held during a two-hour recess at this court's contract rejection hearing on July 22, 1985. The debtor rejected the union's package of wage and fringe benefit suggestions, which would reduce the debtor's present labor costs by between $18,000 and $23,000 and have the union members forego a 50¢-per-hour pay increase. The debtor rejected this plan as inadequate to meet its cost reductions needs.

## DISCUSSION

The debtor's motion to reject its collective bargaining agreement is governed by 11 U.S.C. § 1113. This provision was added to Title 11 by the Bankruptcy Amend-

ments and Federal Judgeship Act of 1984. In the first reported decision applying this section, *In re American Provision Co.*,[8] a Minnesota bankruptcy court identified and applied nine requirements which must be met before a court can authorize the rejection of a collective bargaining agreement. The *American Provision* requirements are as follows:

1. The debtor-in-possession must make a proposal to the union to modify the collective bargaining agreement [1113(b)(1)(A) ];

2. The debtor-in-possession must meet at reasonable times with the union prior to the date of the § 1113 hearing [1113(b)(2) ];

3. At meetings with the union, the debtor must bargain in good faith with the union in attempting to reach mutually satisfactory modifications of the collective bargaining agreement [1113(b)(2) ];

4. The proposals made by the debtor-in-possession must be based on the most complete and reliable information available at the time of the proposal [1113(b)(1)(A) ];

5. The proposed modifications must be necessary for the reorganization of the debtor [1113(b)(1)(A) ];

6. The proposed modifications must assure that all creditors, the debtor and all other affected parties are treated fairly and equally [1113(b)(1)(A) ];

7. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal [1113(b)(1)(B) ];

8. The union must have refused to accept the debtor's proposal without good cause [1113(c)(2) ]; and

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement [1113(c)(3) ].

 The debtor company as the moving party bears the burden of persuasion

---

7. Mr. Mitchell testified that the debtor's labor costs amounted to 69% of the debtor's fixed overhead costs, which is about the average for similar businesses in this industry.

8. 12 B.C.D. 558, 44 B.R. 907 (Bkrtcy.D.Minn., 1984).

on these issues by a preponderance of the evidence.[9] However, once the debtor has established his compliance with these nine requirements by prima facie evidence, the burden shifts to the union to produce evidence contradicting the debtor's compliance with one or more of these nine elements of section 1113.[10]

In the present case, it is clear that the debtor has satisfied the first requirement of section 1113 by submitting various proposals for modifying the existing collective bargaining agreement to the union. It is uncontroverted that the proposal was based on the most complete and reliable information available at the time it was made. Further, the record shows that the debtor met with union representatives on four separate occasions to discuss the proposed modifications to the labor agreement. We believe that the debtor has demonstrated that it met at reasonable times with the union.

Regarding the good-faith negotiation requirement of Section 1113, the union strongly contests the debtor's contention that the negotiations between the two parties were carried out with the requisite good faith. Before evaluating the merits of the union's claims on this issue it is necessary to examine the meaning of "good faith" as the term is used in section 1113 of the Bankruptcy Code. In *In re Wheeling-Pittsburgh Steel Corporation*[11] a Pennsylvania bankruptcy court evaluated the meaning of the term in the following manner:

> Congress apparently did not intend bankruptcy courts to interpret the "good faith" element of § 1113(b)(2) in compliance with labor law precedent. The legislative history to § 1113, scant though it is, supports this conclusion. In particular, Senator Hatch stated that:

good faith negotiations between the parties ... was a requirement articulated by the Supreme Court in the *Bildisco* case. The conference, once again, preserved the spirit of that Court holding by requiring good faith efforts to confer in an effort to reach an agreement between the business and its union employees.

130 Cong.Rec. S8892 (daily ed. June 29, 1984) (hereafter cited as Congressional Record). *See also* Gibson at 327. The "spirit" of the *Bildisco* holding to which Senator Hatch referred is reflected in the following excerpt from *Bildisco:*

> Before acting on a petition to modify or reject a collective bargaining agreement, ... the Bankruptcy Court should be persuaded that *reasonable efforts to negotiate a voluntary modification have been made* and are not likely to produce a prompt and satisfactory solution ... *that court need not determine that the parties have bargained to impasse or make any other determination outside the field of its expertise.*

*Bildisco,* 104 S.Ct. at 1196–97 (emphasis added)[12]

As may be seen from the foregoing discussion, Congress intended section 1113's "good faith" provision to be interpreted by bankruptcy courts in a nontechnical fashion. Therefore, in our opinion, the "good faith" requirements of section 1113 can be satisfied by the debtor showing that it has seriously attempted to negotiate reasonable modifications in the existing collective bargaining agreement with the union prior to the rejection hearing.[13]

After considering the evidence presented on the issue of good faith negotiation by both the union and the debtor, it is our opinion that the debtor has established by a

---

9. *Id.* at 560, 44 B.R. 907 *See also In re Salt Creek Freightways,* 47 B.R. 835, 838 (Bkrtcy.D.Wy. 1985).

10. *In re American Provision Co.,* 12 BCD at 560, 44 B.R. 907.

11. 50 B.R. 969 (Bkrtcy.W.D.Pa.1985).

12. *Id.* at 976.

13. *Id.* at 976. *See also Gibson,* "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113," 58 Am.Bankr.L.J. 325 (Fall 1984) [hereinafter cited as "Gibson"]

preponderance of the evidence that it negotiated in good faith with the union. The testimony offered at the rejection hearing indicated the willingness of both parties to discuss various contract concessions. In fact, the court witnessed at first hand the parties' reasonably accommodating negotiating posture when we recessed the rejection hearing for two hours to allow on-the-spot negotiations. After evaluating the parties' differences on the major issues of health care benefits and salary reductions, it is clear that the parties were unable to reach a compromise on these issues due to their differing interests and the "distance" between their two offers, rather than to any lack of good faith on the part of either party.

Tracking the nine-point formula of *American Provision Co.*, we have found thus far that the employer (1) made a proposal to modify the union contract, (2) met with the union at reasonable times, and (3) bargained in good faith, (4) based upon complete and reliable information.

The fifth step in an *American Provision Co.* analysis focuses on whether the company proposal contains only those modifications which are necessary to a successful reorganization. The testimony of Mr. McGuirk, president of the debtor, was that the modifications contained in the company proposal represented the minimum cost savings necessary to allow the debtor to successfully reorganize. Further, the testimony of Mr. Mitchell established that the proposed concessions were critical if the company wished to survive as a viable business entity. Mr. Mitchell testified that while the last annual financial statements showed that the debtor was still technically solvent, those statements had not been adjusted to show the full impact of the debtor's aging accounts receivable or its obsolete inventory. Mr. Mitchell testified that a reduction of approximately $100,000 per year in labor expenses was necessary for the debtor to show enough gross profit to meet its current expenses and begin to reduce its sizeable trade accounts payable.

Although the union argued that there were other than the company-proposed ways for the debtor to become a profitable entity, the union failed to affirmatively demonstrate that any of the debtor's proposed modifications were unnecessary. Further, the union offered no evidence to rebut the debtor's showing of the necessity of a major reduction in labor costs in order to successfully reorganize. In sum, the union has failed to rebut the debtor's prima facie showing that the proposed changes in the collective bargaining agreement are necessary to permit the successful reorganization of the debtor.

The sixth part of the *American Provision Co.* analysis requires a showing of fair and equitable treatment of creditors, the debtor and all affected parties. This requirement of section 1113 is intended to ensure that where a trustee or debtor-in-possession attempts to reject a collective bargaining agreement, the union members covered by the agreement "do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden." [14] In other words, all parties affected by the bankruptcy must have made or be willing to make contributions to the debtor's reorganization which are proportionate to the concessions contained in the bargaining proposal. This requirement of equivalent sacrifice does not mean that the debtor must formally propose his plan of reorganization prior to seeking rejection of the collective bargaining agreement. Rather the court must look not only to the changes proposed, but also to concessions to be made by creditors, stockholders or owners of the debtor, as well as by other nonunion employees.[15]

In the case before us, the evidence shows that the proposed reductions in wages and benefits are not disproportionate to the

---

14. Reps. Hughes and Morrison 130 Cong.Rec. S8898 (daily ed. June 29, 1984) [hereinafter cited as Cong.Rec.]

15. See Remarks of Sen. Packwood, Cong.Rec. at S8898.

concessions already made by the debtor's clerical and management employees.[16] In the past few years the debtor's nonunion employees have received no salary increases, have been limited in the number of available vacation days, and have had their health care insurance changed from Blue Cross-Blue Shield to the more economical HumanaCare Plus. The concessions the debtor now requests from its union employees are thus consistent with those already made by its other workers.

At the rejection hearing the union's biggest concern in the area of contract modifications was the replacement of the Health & Welfare medical insurance with Humana-Care Plus. After reviewing the two health insurance policies, we conclude that the reduction in coverage which might occur [17] as a result of the change in health insurance policies does not constitute inequitable treatment of the union. We therefore hold that the proposed modifications to the collective bargaining agreement do not unfairly burden the union vis-a-vis other employees of the debtor.

The court also finds that the proposed modifications do not impose a greater burden on the union than on creditors. The record clearly shows the huge backlog of accounts payable that the debtor has accumulated in the past two years. No evidence was brought forth by the union suggesting that creditors have failed to make appropriate concessions in order to aid the reorganization effort.

█ While the union does not seriously contest the fact that nonunion workers and creditors have made substantial sacrifices in the debtor's effort to revitalize its operations, the union does strenuously argue that the principal owner, Mr. McGuirk, has not made his fair share of concessions in

order to aid in the debtor's recovery. This contention represents the union's strongest challenge to the debtor's motion to reject the collective bargaining agreement. While no previously reported case has directly considered the issue, it is clear that the owners of a debtor are "affected parties" for the purposes of section 1113(b)(1)(A).

The union's three main allegations relating to this issue are: (1) that the building the debtor maintains its Louisville operations in is owned by McGuirk, who leases it to the debtor at a profit; (2) that McGuirk purchased a profitable branch of the debtor a little over a year ago and set it up as a separate corporation; and (3) that the debtor does work for the Lexington operation, now owned by McGuirk, at cost rather than at normal billing rates. After carefully evaluating these charges, we find that the president and principal owner of the debtor is not taking unfair advantage of the debtor and is making his fair share of concessions in order to aid the debtor in its reorganization attempt.

First, while it is true that McGuirk owns the building where the debtor's business is located, no evidence was presented by the union that the terms of the lease were either unfair or uneconomical. After reviewing the financial records we cannot find any evidence which indicates that the lease is unfair to the debtor. Second, the union charges that McGuirk improperly took an active profit center from the debtor when he purchased the Lexington branch operation in early 1984. However, the union once again failed to produce any evidence that this transaction was in any way unfair to the debtor.

█ McGuirk testified that he purchased the Lexington Branch for $200,000

---

**16.** Mr. Mitchell testified that overhead expenses directly attributable to the union employees wages and benefits represent approximately 69% of the company's total fixed overhead expenses. The cost savings which would be generated by the debtor's proposed modifications to the labor agreement represent only 58% of the total reductions in fixed overhead needed for a successful reorganization.

**17.** While we agree with the union that in some areas the Health & Welfare Fund medical plan's coverage is superior to that offered by Humana-Care Plus, we can see little overall difference between these two excellent health care policies. From a purely economic standpoint the HumanaCare Plus plan is a far better value.

in cash when that operation needed a capital infusion of nearly $75,000. At that time the debtor corporation could not provide such a capital outlay. McGuirk borrowed and contributed those funds personally. Although a transaction between a controlling shareholder and the corporation is always subject to close scrutiny, it is not per se invalid.[18] If the terms of the transaction between the corporation and its controlling shareholder are basically fair, then the effects of that transaction are the same as if they occurred between any two unrelated parties.[19] While it is a serious allegation to make that the debtor is performing undercompensated work for a corporation owned by its president, the evidence in this case does not support the charge. While some union employees testified that they *believed* that work was being performed at cost for Mr. McGuirk's Lexington operation, and this court does not doubt their sincerity, none of the workers were in a position to have direct knowledge of the billing procedures followed by the debtor. The workers were also unable to bring forth any independent evidence to support this charge.

Finally the court notes that Mr. McGuirk has offered to retire, an action which would result in an annual savings to the debtor of $50,000. Therefore, we hold that the debtor has proven, by a preponderance of the evidence, that the proposed modifications to the collective bargaining agreement ensure that the debtor, creditors and all other affected parties, including the union, are treated in a fair and equitable manner.

The seventh *American Provision* requirement is that the debtor must provide the union with all relevant information necessary to evaluate the debtor's proposal. We believe this debtor has met this requirement. Although the information has at times been late in coming to the union, all delays have been attributable to putting financial information in a usable form. The debtor has constantly offered to allow the union to examine its books and financial records in detail, an offer which the union has, for the most part, declined.

The eighth *American Provision* requirement, that a court may only approve rejection if the union has refused to accept the debtor's proposal "without good cause," was recently construed in the case of *In re Salt Creek Freightways*.[20] There the court stated:

[T]he court finds guidance interpreting § 1113(c)(2) from the following explanatory statements:

The phrase "good cause" is undefined, but the conferees clearly believed that it should be interpreted narrowly by a reviewing court; it certainly was not intended to permit virtually any refusal on the part of the labor representative. It should be on the basis of facts directly resulting from the contract between the debtor and his employees, contract immediately before the bankruptcy judge in the Chapter 11 proceeding. It should not involve contracts with unions other than those immediately before the court.

130 Cong.Rec. H7495 (daily ed. June 29, 1984) (remarks of Rep. Lungren).

The phrase "without good cause" in subsection (c)(2) of the new section 1113 ... is intended to ensure that a continuing process of good faith negotiation will take place before the court involvement.

130 Cong.Rec. H7496 (daily ed. June 29, 1984) (remarks of Rep. Morrison).

The requirement that the union refusal to accept the proposal be "without good cause" is obviously not intended to import traditional labor law concepts into a bankruptcy forum or turn the bankruptcy court into a version of the National Labor Relations Board. Again, the intent is for these

**18.** *Thrasher v. Thrasher,* 27 Cal.App.3d 23, 103 Cal.Rptr. 618 (Cal.1970).

**19.** *Nixon v. Lucas,* 42 F.2d 833 (2d Cir.1930).

**20.** 47 B.R. at 835.

provisions to be interpreted in a workable manner...

130 Cong.Rec. S8888 (daily ed. June 29, 1984) (remarks of Sen Thurmond).

In the spirit of good faith that should permeate these negotiations, however, the unions must not reject the business offer without good cause. This opportunity to accept or reject the proposal should be assessed in light of the essentiality of swift and fair resolution of the initial phases of the reorganization. Accordingly, rejection of a proposal should only happen if the cause for rejection is good enough to risk the damage to the business as well as its creditors and employees that delay or protracted negotiations could produce.

130 Cong.Rec. S8892 (daily ed. June 29, 1984) (remarks of Sen. Hatch).[21]

The *Salt Creek* court concluded its analysis of section (c)(2) by holding that:

... in order to approve an application for rejection, it is not necessary to find that a Union has rejected the debtor's proposal in "bad faith" or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the standpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase "without good cause" in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses.[22]

■ In applying this reasoning to the facts of the case at hand we find that the union rejected the debtor's proposal without good cause. Although the union representatives who testified at the rejection hearing did not directly state the reasoning behind the union's rejection of the debtor's proposal, the union's rationale for its rejection of the debtor's proposal can be inferred from general testimony regarding the progress of the negotiations. Aside from some feelings that the union's workers were being unfairly treated and some doubts as to the good faith of the debtor during the course of the negotiations, the main reason behind the union's rejection of the debtor's proposal apparently was due to a policy determination that the union could not voluntarily negotiate away the medical coverage provided by its Health and Pension Fund, an entity related to the union. While this is not an unreasonable basis for rejecting the debtor's proposal, it does not constitute "good cause" within the meaning of section 1113(c)(2).[23]

Therefore, in light of our previous findings that the debtor negotiated in good faith and that all parties were treated fairly by the terms of the proposed modifications to the collective bargaining agreement, the court concludes that the union's refusal to accept the debtor's proposal in this case was without good cause within the meaning of section 1113(c)(2).

The final issue to be resolved in this case is whether the balance of the equities clearly favors rejection of the bargaining agreement. This requirement is a statutory codification of the standard for rejection espoused by the United States Supreme Court in *N.L.R.B. v. Bildisco and Bildisco*.[24] In defining this "balancing of the equities" test the Supreme Court stated:

The Bankruptcy Court is a court of equity, and in making this determination, it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities.

The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather how the equities relate to the success of the reorganization ... the Bankruptcy Court

---

**21.** *Id.* at 840.

**22.** *Id.*

**23.** *See Id.* at 841.

**24.** 104 S.Ct. at 1188.

must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.[25]

Under this standard the primary question in a balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization.

In this proceeding the rejection of the debtor's collective bargaining agreement would give the debtor a chance to rehabilitate itself.[26] The debtor has shown that without the rejection of its present collective bargaining agreement it will soon be forced to cease operations and liquidate. The debtor has clearly shown that even with all the nonlabor cost reductions it has already made it is still losing money. This situation was recognized by the bankruptcy court in the *Wheeling-Pittsburgh* case where the court stated:

> ... either the labor costs are reduced or the losses will continue. Present labor costs are simply above the Company's ability to pay. This situation of financial distress is not the fault of either party. But the inescapable fact is that the continuing losses must be stopped if the Company is to reorganize.[27]

If we denied the debtor's motion to reject the labor agreement, the union's victory would be both temporary and pyrrhic. "Contracts with a liquidated company [only] offer hollow promises."[28] Accord-

ingly, the court finds that the debtor has met its burden of proof on this issue.

In conclusion we note that our decision in this matter does not mark an end but rather a new phase in the negotiations between these parties. Although we have granted the debtor's motion to reject the collective bargaining agreement, our holding does not mean that the union and its members are totally stripped of their bargaining power. Following the rejection of a collective bargaining agreement the status of the union as the exclusive bargaining representative remains unchanged.[29] Further, the employees retain the right to strike as their ultimate bargaining tool.[30] In addition, our granting of the debtor's motion in this matter does not divest this court of jurisdiction over future proceedings in this case. The debtor has a continuing duty both to bargain in good faith and to operate its business in a fair and commercially reasonable manner. If the union or any other party in interest can produce evidence that the debtor has failed in any of those duties required by bankruptcy law, then this court can hear their complaint and take appropriate measures. We do not believe that such extreme measures as we have described in the preceding sentences will be necessary in the present case. Throughout the proceedings the parties have indicated a willingness to talk and attempt to resolve their problems. The ultimate fate of the debtor's reorganization effort lies not in this forum, but at the bargaining table. We cannot compel, but we do encourage the union and the debtor to continue their negotiations, for without a settlement of this labor conflict the likelihood of the debtor being forced to liquidate is very real indeed.

25. *Id.* at 1197. *See also In re Wheeling Pittsburgh Steel Corporation,* 50 B.R. at 983.

26. At the present time we do not have to rule on what effect the presently pending wrongful death action will have on the debtor's chances to successfully reorganize.

27. 50 B.R. at 983–984.

28. Remarks of Sen. Hatch 130 Cong.Rec. S6091 (daily ed. May 21, 1984).

29. *N.L.R.B. v. Bildisco and Bildisco,* 104 S.Ct. at 1201; *In re Salt Creek Freightways,* 47 B.R. at 842; *In re American Provision Co.* 12 B.C.D. at 560, 44 B.R. 907.

30. *In re Crowe & Associates, Inc.,* 713 F.2d 211 (6th Cir.1984).

For the foregoing reasons, the Court by separate order will sustain the debtor's motion to reject the contract.

### ORDER

Consistent with the Memorandum Opinion of September 6, 1985 in the above styled case and with the Federal Rules which require final orders to be reflected in a document separate and apart from any supporting memorandum, and the Court being sufficiently advised; IT IS HEREBY ORDERED that the motion of Kentucky Truck Sales, Inc. to reject its labor agreement with the General Drivers, Warehousemen, and Helpers Union Local No. 89 be and is hereby GRANTED.

THIS IS A FINAL ORDER.