CARDAMONE, Circuit Judge:
This appeal deals with one aspect of the existing tension between the Bankruptcy Code and the National Labor Relations Act. Today companies in financial distress often look to the bankruptcy court for protection from deregulation, litigation, ruinous international competition and other economic hardships. Under Chapter 11 of the Code a debtor may be allowed to modify its existing labor agreements and thereby reduce costs. On the other hand, to permit the unilateral rejection by an employer of a bargained-for agreement flaunts national labor policy. On February 22, 1984 the Supreme Court decided NLRB v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which held that a debt- or in bankruptcy did not commit an unfair labor practice by unilaterally terminating provisions of a collective bargaining agreement. The decision sparked intense congressional debate regarding the circumstances under which an existing labor contract could be rejected in Chapter 11 cases.
The institutional tension between labor and bankruptcy law culminated in the Senate when two bills were introduced: the first sponsored by Senator Packwood was hostile to the notion that employers in bankruptcy could unilaterally reject collective bargaining agreements or make more than minimal modifications in order to permit reorganization; the second presented by Senator Thurmond favored a debtor’s power to avoid its agreement, although not unilaterally for 30 days. A House-Senate Conference Report adopted a compromise approach to the conflict by overruling the unilateral power to reject given the debtor in Bildisco, and by setting forth certain requirements to be met before rejection of a collective bargaining agreement. The Report was passed overwhelmingly in both Houses and signed into law by the Presi *267 dent on July 10, 1984. See Rosenberg, Bankruptcy and the Collective Bargaining Agreement — A Brief Lesson in the Use of the Constitutional System of Checks and Balances, 58 Am.Bankr.L.J. 293, 308-21 (1984).
Here a union challenges the scope of a bankruptcy court’s authority under the new law, 11 U.S.C. § 1113 (Supp. II 1984),[1] to allow a Chapter 11 debtor to propose modifications of vested retiree health insurance benefits and — upon the union’s refusal to bargain on this issue — to reject the collective bargaining agreement. Throughout this litigation the union has maintained that it is not the retirees’ “authorized representative,” and that the debtor is required to negotiate any changes in vested benefits directly with the retirees so as to obtain their consent. The union contends that because the debtor insisted on bargaining over retiree benefits it violated the good faith requirement of § 1113. As a result, the union argues that it had “good cause” to reject the debtor’s proposal.
The bankruptcy and district courts both found that the debtor’s proposal to the union to eliminate vested retiree benefits did not constitute a sufficient basis to prevent the debtor from rejecting the labor agreement under § 1113. We agree that vested retiree insurance benefits are a proper subject of bargaining. But since a conflict of interest between active employees and retirees precludes the union from representing both, we remand the case to the bankruptcy court so that it can appoint a representative for the retirees in these negotiations.
I FACTS
Century Brass Products, Inc. (Century, company, or debtor) came into existence in 1976 when it purchased the major assets of the Scovill Manufacturing Company located in Waterbury and New Milford, Connécti- *268 cut. Included in the sale were a metals and a general products divisions; the former operated brass mills and the latter manufactured products for the automotive industry and the United States’ military program. The purchase price was $30 million, $12 million of which was paid in cash. The remainder was accounted for by the Company’s assumption of Scovill’s $18 million vested pension and insurance obligations due its hourly and salaried employees.
Since 1976 Century has recognized the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) and its Local 1604 (collectively referred to as the Union) “for the purpose of collective bargaining in respect of wages, rates of pay, hours of employment, and other conditions of employment ... as the sole and exclusive representative of all hourly and incentive paid production and maintenance employees employed in the metals division including the New Milford plant, the General Products division, and Waterbury services.” Following the acquisition, Century and the Union entered into a series of collective bargaining agreements.
From the time of acquisition, Century experienced a downturn in business precipitated primarily by worldwide events that had a negative impact on the American brass industry. Operating losses were incurred for the fiscal years ending in April 1980-1983. The 1983 loss exceeded $9 million. In fiscal year 1984 Century realized a minimal profit of $523,704 on sales of $141 million, with this small profit due in large part to an insurance settlement. By February 1985 the availability of cash under its financing arrangement approached zero. To deal with its urgent need for operating funds, Century devised plans to reduce operating costs.
Those salaried employees not represented by the Union agreed to wage and benefit reductions totaling $2.3 million. Coupled with this, Century’s president met with the UAW on February 25, 1985 to discuss wage and benefit concessions. The company emphasized that unless the UAW agreed to a $2.5 million reduction, the historically unprofitable metals division would be closed. Were this to occur, the inevitable transfer of overhead expenses to the general products division would then jeopardize its existence. On March 3, 1985 the UAW members voted to reject any modifications of the collective bargaining agreement. The following day Century closed the metals division and laid off 700 employees. Attempts by a local Congressman and the Mayor of Waterbury to resolve the conflict were unavailing.
Shortly thereafter, Connecticut Light & Power Company told Century that its electrical power would be turned off in 15 days unless an overdue payment of $2.5 million was made together with a one-month deposit. Connecticut Power also attached Century’s bank accounts. On March 15, 1985 Century filed a bankruptcy petition under Chapter 11. Scheduled liabilities totaled over $103 million, while assets listed in the petition amounted to only $71 million. A loss of $7 million was projected for the fiscal year ending April 30, 1985 with anticipated net sales of $62 million and costs of approximately $69 million. The bankruptcy court found that Century faced $40 million of non-modifiable expenses, leaving $22 million for payment of wages and benefits to all of its non-union salaried and bargaining unit employees. Labor costs under the existing collective bargaining agreement amounted to $19,912,000. Thus, were Century unable to modify its labor agreement, it would be forced to reduce its non-union salaried employees’ wages from over $9 million to about $2 million.
After filing its Chapter 11 petition Century initiated a series of meetings with the UAW to discuss the changes essential to the survival of the general products division and to answer questions regarding its Chapter 11 petition. During these informal negotiations held on April 3, 9 and 10,1985, Century raised the possibility of terminating the pension plan, which cost it approximately $3 million annually. The UAW re *269 jected this proposal. By letter dated April 16 Century’s vice-president for corporate services requested a formal negotiating session. Century and the UAW negotiating committees met again on April 23.
At this meeting, the company again proposed the following modifications of the collective bargaining agreement: termination of the existing pension plan and institution of a new plan, changes in the medical plan through the addition of a deductible and/or employee contributions, waiver of negotiated changes in wages for 1985 and 1986, and a new vacation plan. The UAW responded that the retiree insurance benefits for those already retired were vested and of lifetime duration.[2] As a consequence, the Union maintained that it could not negotiate these benefits through collective bargaining. Rather, if Century wanted to reduce those benefits, direct negotiation with the retirees to obtain their consent was necessary. On April 26 the UAW and Century met with officials of the Pension Benefit Guaranty Corporation (PBGC) and were advised as to the benefits the PBGC would guarantee to eligible persons should the existing plan be terminated.[3]
The debtor provided the UAW with information on April 29 that detailed the status of the company, its financial data, and its proposed resolution of various operational problems. The parties met again on April 30, May 8, and May 13. The Union reiterated that it could not consider any proposal involving modification of retirees’ benefits. At the May 8 meeting Century presented an economic proposal that was part of an overall plan to reduce its projected losses from $7 million in the ensuing year to a profit of $287,000 on sales of $62 million. The proposal called for contract modifications and the termination of vested retiree insurance benefits. The UAW wanted retiree insurance benefit reductions removed as a topic of negotiation. In response, Century presented a revised proposal at the final pre-hearing negotiating session. Because the proposal still called for the complete elimination of retiree insurance benefits for approximately 700 pre-acquisition hourly retirees and for a significant reduction in the insurance benefits of 500 post-acquisition retirees, the UAW refused to take Century’s offer to its active employee membership for a vote.
On May 17 Century filed the present application in the bankruptcy court for an order pursuant to § 1113 terminating its collective bargaining agreement with the UAW. The Union appeared and objected. From May 31 through July 12 hearings were held on the application. On July 26 the bankruptcy court (Krechevsky, B.J.) granted Century’s application. On November 7 the United States District Court for the District of Connecticut (Cabranes, J.) affirmed the order rejecting the labor agreement and this appeal followed.
II THE UAW’S ARGUMENT
The UAW contends on appeal, as it did below, that the bankruptcy court erred in *270 finding that the debtor had satisfied all the prerequisites to the rejection of the collective bargaining agreement as set forth in § 1113. Specifically, the Union claims that Century’s proposed modifications to the collective bargaining agreement that reduce the retirees’ vested benefits are inconsistent with § 1113(c). Such modifications are outside the scope of § 1113(c), according to the Union, because the Union is not the “authorized representative” of the retirees, the proposal is not limited to “modifications in the employees’ benefits and protections” and the Union therefore has “good cause” to reject such modifications.
As support for this position the UAW relies primarily on Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass, 404 U.S. 157, 159-60, 92 S.Ct. 383, 387-88, 30 L.Ed.2d 341 (1971). In a non-bankruptcy setting, that case addressed whether an employer’s mid-term unilateral modification of retired employees’ benefits constituted an unfair labor practice. In order to find such a practice, the court must first find a duty by the employer to bargain with the union concerning retirees’ benefits. Such an obligation normally would exist if: (1) the retirees were “employees” as defined in NLRA § 2(3), 29 U.S.C. § 152(3)(4); or (2) these “employees” were members of the collective bargaining unit for which the union is the sole authorized bargaining representative, NLRA § 9(a), 29 U.S.C. § 159(a). See id. at 164-66, 92 S.Ct. at 389-90. The Court concluded that retirees do not fall within the statutory definition of employee, id. at 165-71, 92 S.Ct. at 390-93, reasoning that the statute was concerned with the collective bargaining rights of workers, not retirees without expectation of further employment. Those labor disputes that Congress made subject to collective bargaining were between employers and active employees, a grouping that clearly does not encompass individuals who have retired from the workforce. Id. at 166, 92 S.Ct. at 390.
Pittsburgh Plate Glass then considered whether retirees, even though not employees within the meaning of the collective bargaining obligations of the Act, could nevertheless be included within the bargaining unit for which the union was the exclusive bargaining representative pursuant to § 9(a). Id. at 171, 92 S.Ct. at 393. On that issue it also held that the retirees “were not and could not be ‘employees’ included in the bargaining unit.” Id. at 172, 92 S.Ct. at 394. Aside from noting that retired workers did not come under the concept of employee as embodied in § 9(a), the Court found lacking sufficient indicia of a mutuality of interest between the retirees and current workers, thereby precluding placing the two in the same bargaining unit. Id. at 172-75, 92 S.Ct. at 393-95. It stated:
Here, even if, as the Board found, active and retired employees have a common concern in assuring that the latter’s benefits remain adequate, they plainly do not share a community of interest broad enough to justify inclusion of the retirees in the bargaining unit. Pensioners’ interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment. Incorporation of such a limited-purpose constituency in the bargaining unit would create the potential for severe internal conflicts that would impair the unit’s ability to function and would disrupt the processes of collective bargaining. Moreover, the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees’ benefits.
Id. at 173, 92 S.Ct. at 394.
Finding that the retirees were neither employees nor members of the collective bargaining unit did not end the analysis because issues that affect non-employees may nonetheless be mandatory subjects of bargaining between a union and employer when the issues involved “‘vitally’ affect the ‘terms and conditions of employment’ of active employees____” Id. at 176, 92 S.Ct. at 396 (quoting Board decision below at 177 N.L.R.B. 911, 915 (1969)). The Court stated that “the question is not *271 whether the third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it vitally affects the ‘terms and conditions’ of their employment.” Id. at 179, 92 S.Ct. at 397. Within this rubric, the issue was “[t]he benefits that active workers may reap by including retired employees under the same health insurance contract”, benefits which were found to be “speculative and insubstantial at best.” Id. at 180, 92 S.Ct. at 398.
The Supreme Court therefore concluded “that the effect that the Board asserts bargaining in behalf of pensioners would have on the negotiation of active employees’ retirement plans is too speculative a foundation on which to base an obligation to bargain.” Id. at 182, 92 S.Ct. at 399. Consequently, it was not a mandatory subject of bargaining. The Union urges that Pittsburgh Plate Glass disposes of the present controversy. It points specifically to the statement that even when a union has affirmatively bargained for retiree benefits, “[ujnder established contract principles, vested retirement rights may not be altered without the pensioner’s consent.” Id. at 181 n. 20, 92 S.Ct. at 398 n. 20.
In addressing the conflict between labor and bankruptcy law, the bankruptcy court relied on Senator Thurmond’s observations that § 1113 had to be interpreted in a “workable manner.” See 130 Cong.Rec. S 8888 (daily ed. June 29,1984); reprinted in 1984 U.S. Code Cong. & Ad. News 583. According to the bankruptcy judge this meant that “[i]f.a union seeks to negotiate benefits for its retirees, and bankruptcy ensues, the union cannot call up the [Pittsburgh Plate Glass ] doctrine, deny any responsibility for representation of the retirees, and, thereby, entirely frustrate § 1113.” Although the district court also reached this result, it simply found that Pittsburgh Plate Glass did not support the UAW’s position.
We agree in general with the reasoning of the bankruptcy and district courts, but for the reasons set forth below reach a different conclusion as to the representation of retirees in this case.
Ill BILDISCO
Prior to the Supreme Court’s decision in Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, we required a debtor to demonstrate that its efforts at reorganization would be thwarted unless it could reject its collective bargaining agreement as an executory contract under the former Bankruptcy Act, and that the balance of equities favored rejection. See Shopmen’s Loe. U. No. 455, etc. v. Kevin Steel Prod., Inc., 519 F.2d 698, 707 (2d Cir.1975) (court focuses only on balance of equities); see also Brotherhood of Railway, etc. v. REA Express, Inc., 523 F.2d 164, 167-69 (2d Cir. 1975), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1976) (applying collective bargaining agreement subject to the Railway Labor Act, 45 U.S.C. § 151 et seq. (1982)).
Bildisco resolved a disagreement among the circuits as to the proper standard for rejecting a collective bargaining agreement. The traditional business judgment standard governs the rejection of ordinary executory contracts. See e.g., Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943). But, collective bargaining agreements, as cornerstones of labor law, have traditionally been accorded a higher status than the normal executory contract. Accordingly, the standard for rejecting a collective bargaining agreement is more stringent. Bildisco, 465 U.S. at 523, 104 S.Ct. at 1195. At the same time, Bildisco rejected the very strict standard we adopted in REA Express because it was “fundamentally at odds with the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code.” Id. at 525, 104 S.Ct. at 1196. Specifically, the Court believed that requiring a court to focus only on whether disallowing rejection would cause the debt- or to go into liquidation would subordinate the multiple, competing considerations of Chapter 11 reorganization to one issue only. Moreover, the evidentiary burden *272 necessary to meet such a standard would present difficulties which would interfere with the reorganization process. Id.
Instead an equitable standard was devised which requires that the bankruptcy court make four findings before the debt- or’s petition for rejection may be granted. These are as follows: (1) the collective bargaining agreement burdens the estate; (2) the equities favor rejecting the labor contract; (3) reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution; and (4) allowing rejection would further the policy of Chapter 11 to permit successful rehabilitation of debtors. Id. at 526-27, 104 S.Ct. at 1196-97. The parties need not bargain to impasse since determining whether an impasse had occurred would take the bankruptcy court outside the area of its expertise. Rather, the court should make a “reasoned finding on the record” why rejection should be permitted, which would include considering the likelihood and consequences of liquidation without rejection, the reduced value of creditors’ claims and subsequent hardships on them, and the impact on the employees. In that process, a court must balance the interests of the affected parties and the equities of the situation as they relate to the success of the reorganization.[4] Id. at 526,104 S.Ct. at 1196.
The first part of Bildisco — which established the proper standard for judicial determinations of when a collective bargaining agreement can be rejected — was decided unanimously. But in a controversial 5-4 vote, the Supreme Court further held that a debtor in bankruptcy, prior to obtaining judicial approval to reject the collective bargaining agreement, may unilaterally terminate or modify provisions of the agreement without committing an unfair labor practice under either § 8(a)(5) or § 8(d) of the NLRA. Id. at 534, 104 S.Ct. at 1200.
IV CONGRESSIONAL RESPONSE
This second part of Bildisco, which held that a debtor could rescind the labor contract immediately upon filing under Chapter 11, fueled the already noted lobbying effort by organized labor to have Congress amend the law. In fact, on the same day Bildisco was decided, Congressman Rodino introduced H.R. 4908 to “clarify the circumstances under which collective bargaining agreements may be rejected.” H.R. 4908, 98th Cong., 2d Sess., 13Q Cong.Rec. H 809 (daily ed. February 22,1984). These efforts resulted in the passage of the 1984 Amendments Act of § 1113 of the Bankruptcy Code. That statute now controls the rejection of collective bargaining agreements in Chapter 11 proceedings.
Section 1113 reversed the second part of Bildisco. It created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion. Employers may only propose modifications in an existing labor contract that are necessary to permit an effective reorganization of the debtor. Further, the debtor must propose these modifications to the union before seeking approval to reject its collective bargaining agreement. 11 U.S.C. § 1113(b)(1)(A). Only if the expedited bargaining fails does § 1113 permit a debtor to apply for rejection of the labor agreement. At that point, a modified version of the unanimously decided first part of Bildisco applies.
*273 Since § 1113 was passed within five months of Bildisco, it has only a meager legislative history. See Rosenberg, supra, 58 Am.Bankr.LJ. at 308-21. Congress was unable to agree on a Committee Report to accompany the law. Thus, only the comments read into the Congressional Record by various members of Congress on June 29, 1984 — the date the Bankruptcy Amendments and Federal Judgeship Act of 1984 were enacted — are available. P.L. 98-353, 98 Stat. 333. Our analysis will include these statements and the few cases that have interpreted the new law.
V DISCUSSION
A. Procedure
Before addressing the substantive standards of § 1113, we turn first to the procedures required by that provision. The new law encourages the collective bargaining process as a means of solving a debt- or’s financial problems insofar as they affect its union employees. Senator Pack-wood observed that it “places the primary focus on the private collective-bargaining process and not in the courts.” 130 Cong. Rec. S 8898 (daily ed. June 29, 1984). Hence, in order to obtain court approval for rejecting a labor contract, the debtor — after filing its Chapter 11 petition but before seeking such approval — must follow a two-step procedure: first, it must make a proposal to the union accompanied by the kind of relevant and reliable information needed to evaluate it; second, it must bargain in good faith with the union. Only after having demonstrated compliance with the above, without success, may a debtor seek court approval for rejection. § 1113(b)(1) & (2).
B. Substantive Standards
If the outlined procedure is followed without resolution, the application for rejection comes before the bankruptcy court which may, under § 1113(c), approve rejection of the labor agreement after making three separate findings: (1) the debtor has made a proposal that satisfies § 1113(b)(1); (2) the employees’ authorized representative has rejected such proposal without “good cause”; and (3) “the balance of equities” clearly favors rejection. Gibson, The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. §1113, 58 Am. Bankr.L.J. 325, 335 (1984). We examine each of these requirements briefly.
The standards set forth in § 1113(b) require that any proposal include those “necessary” modifications in the collective bargaining agreement “that are necessary to permit reorganization of the debtor____” The use of the word “necessary” twice in § 1113(b)(1)(A) emphasizes the requirement of the debtor’s good faith in seeking to modify its existing labor contract. 130 Cong.Rec. S 8898 (statement of Senator Packwood). The court must also assure itself that “all creditors, the debtor and all affected parties are treated fairly and equitably.” The purpose is to spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree.
The meaning of the “good cause” language in the requirement that “[t]he authorized representative of the employees has refused to accept such proposal without good cause,” § 1113(c)(2), is best summarized by Senator Packwood. He explained that this “serves to prohibit any bad faith conduct by an employer, while at the same time protecting the employer from a union’s rejection of the proposal without good cause.” 130 Cong.Rec. S 8898. As Senator Thurmond noted, bargaining in good faith is not intended to import labor law into the bankruptcy forum. Rather, “the intent is for these provisions to be interpreted in a ‘workable manner’ ”. Id. at 8888, reprinted in 1984 U.S. Code Cong. & Ad. News 583. Finally, the “balance of equities” codifies the unanimous holding set forth in the first part of Bildisco, 465 U.S. at 525-26, 104 S.Ct. at 1196.
Our construction of the statute follows from its plain language and the comments of its sponsors in Congress. Moreover, a *274 number of courts have generally adopted the same approach in interpreting the statute in cases arising under it. See In re Kentucky Truck Sales, Inc., 52 B.R. 797 (Bankr.W.D.Ky.1985); Matter of K & B Mounting, Inc., 50 B.R. 460 (Bankr.N.D.Ind.1985); In re Salt Creek Freightways, 47 B.R. 835 (Bankr.D.Wyo.1985).
C. Application of Standards to This Case
Applying these standards to the instant case, we address the threshold question of whether Century made a proposal under § 1113(b)(1)(A) to the employees’ authorized representative covered by the agreement. The answer to this question is central to the resolution of the case before us.
The UAW claims that it is not the authorized representative of retired union members who, although covered by the agreement, are no longer active workers. Retirees lack the essential rights of union members. For example, under the Union constitution retirees are members of the union, but they are not entitled to vote in ratification of collective bargaining agreements. In Pittsburgh Plate Glass, the Court held that the union had no statutory duty to represent the interests of retirees— as nonbargaining unit members — when making economic decisions for those it does represent. The Supreme Court further observed. that vested retirement rights may not, absent the retirees’ consent, unilaterally be altered without giving rise to a § 301 Labor Management Relations Act suit for breach of contract. 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20 .
The bankruptcy court rejected this argument on the ground that the “unavoidable conflict between federal labor law and bankruptcy law” was resolved by the Supreme Court in Bildisco, and thus “[t]he union, having voluntarily negotiated benefits for its retired members, has the accompanying responsibility, at least initially, to act in the bankruptcy context as the retirees’ representative under § 1113.” The district court reached the same result, reasoning that “[t]he Congress that enacted Section 1113 most likely assumed, consistently with Pittsburgh Plate Glass, that the rights of retired workers ‘vitally affect’ the rights of current workers whenever their common employer files for protection under Chapter 11.”
We agree with the district court that the rights of retired workers “vitally affect” the rights of active workers within the meaning of Pittsburgh Plate Glass when their employer files a Chapter 11 petition. In a Chapter 11 context a refusal to negotiate a reduction in retiree benefits under § 1113 will “vitally affect” active employees in two possible ways: first, it could mean that, as is the case here, they will have to bear a much larger reduction in wages and benefits in order to permit reorganization because of the significant cost of the retiree benefits; second, and more importantly, if retiree benefits cannot be renegotiated, the debtor’s reorganization may well fail, in which case the active employees would most likely lose their jobs and benefits.
The district court further correctly observed that the level of benefits provided to retirees affects “the ability of Century Brass to remain in business,” an effect far more serious than any identified by the Supreme Court in Pittsburgh Plate Glass. Labor law jurisprudence therefore does provide a basis for finding that a change in retirees’ benefits is properly a mandatory subject of bargaining between Century and the UAW. Pittsburgh Plate Glass, 404 U.S. at 176-86, 92 S.Ct. at 396-401.
The policies of bankruptcy law also compel this result. It is true that Pittsburgh Plate Glass held that retirees are not employees as defined in § 2(3). Yet, if retirees benefits are subjects of bargaining between the union and the employer, and no modification can occur absent the retirees’ consent, those retirees must be represented in the negotiations. In order to promote “the policies of flexibility and eq *275 uity built into Chapter 11 of the Bankruptcy Code,” Bildisco, 465 U.S. at 525, 104 S.Ct. at 1196, retirees should properly be characterized as “employees” for purposes of applying § 1113. Therefore, they are generally capable of being represented by the union as their “authorized representative.”
Concededly, the most “workable” interpretation of § 1113 would logically then require that a union always represent both current and former employees of the debtor in any negotiation for collective bargaining modifications made under Chapter 11. To state such a requirement as an absolute may, as here, pose a serious question as to whether the Union has a conflict of interest. It may not always be appropriate for a union to represent both active and retired workers in modification negotiations. The Supreme Court acknowledged the conflict in Pittsburgh Plate Glass, 404 U.S. at 172-73, 92 S.Ct. at 393-94, as discussed earlier, and though it was in another context, this view is relevant when construing § 1113. Therefore, we decline to adopt a per se rule holding that a union is always the appropriate party to represent the interests of retirees whose former employer is in a Chapter 11 reorganization proceeding.
When the suitability of representation on account of a conflict of interest is raised the bankruptcy court should make a determination as to whether a conflict actually exists. If a conflict is found, a representative for the class of retirees should be appointed by the bankruptcy judge. Although this departs somewhat from a literal reading of § 1113, well-established precedent for an appointment of this sort is found in other areas of the law. See, e.g., In re Amatex Corp., 755 F.2d 1034, 1043 (3d Cir.1985) (guardian ad litem appointed for future unknown asbestos victims of debtor); Adelman on Behalf of Adelman v. Graves, 747 F.2d 986, 987 (5th Cir.1984) (district court’s dismissal of complaint reversed and case remanded for court to consider appointment of guardian ad litem on behalf of incompetent pursuant to Fed.R. Civ.P. 17(c) because of potential conflict with temporary guardian). In re Amatex Corp. is useful for our purposes because in that case unknown victims of asbestos poisoning were found to be sufficiently affected by the Chapter 11 reorganization proceedings of an asbestos manufacturer to require representation, particularly where none of the current litigants had interests similar to those of the potential future claimants. 755 F.2d at 1042-43.
The UAW has steadfastly refused throughout the expedited collective bargaining negotiations and all judicial proceedings to represent the retirees. Further, the record amply demonstrates that a conflict of interest exists between active and retired employees. For example, after Century closed its metals division, its workforce was reduced to about 900 employees, 650 of whom the Union represented. The general products division was forced to absorb all of the overhead and many of the metals division’s personnel costs. The collective bargaining agreement provided for payment of medical and pension benefits to more than 1,300 retired employees and their families. The workforce reduction at the metals division did not eliminate these costs. As a result, each of the 650 remaining active bargaining unit employees must now support medical and pension benefits for two retired employees and their families. The active workers are interested in decreasing this heavy financial burden. Conversely, dependent on their pension and health benefits and no longer drawing salaries, retirees want their benefits reduced as little as possible.
Doubtless, it would be more expedient if a union could always represent both active and retired workers. Yet to allow that here would cast doubt on the value of bargained-for rights and call into question the adequacy of pre-deprivation representation in the collective bargaining process. The same union cannot fairly represent two *276 such divergent interests. Here, we conclude that a conflict exists as a matter of law. The UAW therefore may not represent the retired employees. Such must be the rule if, as Congress aimed, bankruptcy law is to be reconciled with labor law principles. Our sister circuit in Wheeling-Pittsburgh Steel Corp. v. United Steel Workers of America, 791 F.2d 1074 (3d Cir.1986) apparently thought that Congress swung the pendulum back in favor of labor as a reaction to Bildisco. The predicate of this opinion is rather that the Senate and House Conferees made the point clear that the road to resolution of the conflict between labor and bankruptcy principles lies in honest compromise.
The debtor as the moving-party seeking rejection of its collective bargaining agreement has the burden of persuasion on the procedural requirements and substantive standards of § 1113. Inasmuch as Century has failed to meet its threshold burden of negotiating with a representative of the company’s retired employees covered by that agreement, it therefore has failed to comply with the procedural requirements of § 1113.
VI CONCLUSION
Accordingly, the judgment of the district court is reversed, and the case remanded with instructions that the bankruptcy court appoint a representative for the retired employees of the debtor, and for such further proceedings under § 1113 as are appropriate.

. Code § 1113 provides in pertinent part:
(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by Title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section. (b) (1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee shall—
(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.
(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the [debtor] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
(1) the [debtor] has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
(2) the authorized representative of the employees has refused to accept such proposal without good cause; and
(3) the balance of the equities clearly favors rejection of such agreement.
(d) (1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing____
(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing____ If the court does not rule on such application within thirty days after the date of the commencement of the hearing the [debtor] may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.
(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

. Whether retirees’ insurance benefits extend beyond the term of a collective bargaining agreement is determined by reference to the terms of the contract and the parties’ intent. See UAW v. Yard-Man, 716 F.2d 1476, 1479 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). The bankruptcy court made no finding as to the parties’ intent, considering it unnecessary to resolve this issue. We assume, as that court did, that the benefits were of lifetime duration.

. The PBGC was established by Title IV of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001. This government corporation assumes the obligation of guaranteeing certain employee benefits when a pension plan is terminated. If Century terminates its plan, the pension benefits for all former Scovill employees now retired will be guaranteed by the PBGC. The Basic Retirement Plan provides for $12 per month per year of employee service. At least $11.80 of that benefit is guaranteed. There is a question whether the remaining $.20 is guaranteed for persons who retired after 1979. The fact that an eligible employee has not yet retired or applied for his benefit does not affect any guarantee that is available. For those employees with 30 years service who took early retirement, the $230 supplement payable between ages 60 and 62 is not guaranteed. Only 20 or 30 of the 1,300 retirees receive this supplement.

. The Court emphasized the focus of the bankruptcy court under the equitable standard as it decided whether to grant a rejection petition.
The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court’s inquiry is of necessity speculative, and it must have great latitude to consider any type of evidence relevant to this issue.