**In re TEXAS SHEET METALS, INC., Debtor.**

**Bankruptcy No. 86–05784–H1–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

May 26, 1988.

**262**

Patrick F. Timmons, Jr., Houston, Tex., for debtor.

Marc Evan Kutner, Houston, Tex., for Carpenters District Council of Houston and Vicinity and Millwrights Local Union No. 2232.

Patrick Flynn, Watson, Flynn & Bensik, Houston, Tex., for Sheet Metal Workers' Local Union No. 54.

## MEMORANDUM OPINION

MANUEL D. LEAL, Bankruptcy Judge.

Pending before the court is an application by the debtor, Texas Sheet Metals, for an order allowing rejection of its collective bargaining with the Carpenters District Council of Houston and Vicinity, Millwright Local Union No. 2232, and the Sheet Metal Workers' Local Union No. 54, AFL–CIO. After careful consideration of the pleadings, the evidence, and the relevant statutory and case law, the debtor is allowed to reject its collective bargaining agreements with the unions.

## FACTUAL BACKGROUND

Texas Sheet Metals was formed in 1958. The debtor's business consists of fabrication of sheet metal and related components for commercial and industrial use. Randy Pinter, the debtor's president, and his brother, Mark Pinter, the debtor's vice-president, bought the business from their father. Randy Pinter testified on March 12, 1987, that the debtor's business began to decline in 1982 due to the recession that had begun in the industry. In early 1983, the debtor borrowed $200,000 from Allied Bank to operate its business. The debtor filed its bankruptcy petition on July 1, 1986 after loosing money from 1982 to 1986.

A motion to reject the collective bargaining agreement was filed by the debtor on August 18, 1986. This motion requested authority to reject the collective bargaining agreements with Sheet Metal Workers Local Union No. 54 ("Local No. 54"), Millwright Local Union No. 2232 ("Local No. 2232"), Pipefitter Local Union No. 211 ("Local No. 211"), Sheet Metal Workers International Association, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States of America, and United Brotherhood of Carpenters.[1] At the first hearing on this matter on October 8, 1986, the Carpenters District Council of Houston and the three local unions appeared. At a hearing on December 2, 1986, Local No. 211 consented to rejection of its collective bargaining agreement, leaving only the other two local unions to contest the debtor's motion.

## LEGAL ANALYSIS

A threshold issue in any contested matter or adversary proceeding is the jurisdiction of the bankruptcy court. 28 U.S.C. Section 1334 vests original and exclusive jurisdiction of all cases under Title 11 in the district court. 28 U.S.C. Section 157 states that the district court may provide

---

1. The debtor asserts that the "three national and international unions were served by and through their local union affiliates, but none have appeared before the court or filed an answer." Therefore, the debtor asserts that a default judgment is proper against these three unions. Local No. 54's brief responds, and both unions argued at the hearing on October 8, 1986, that service on the local unions is not equivalent of service on the international unions. Local No. 54 also points out that evidence was not presented indicating that the debtor met any of the criteria set forth in 11 U.S.C.

Section 1113, regarding the separate industrial maintenance agreement that it has with the international union, and therefore, the international union contract is not properly before the court for consideration. This court agrees with Local No. 54. The debtor has presented no authority for the proposition that service upon a local constitutes proper service upon the international union. The international unions have a right to due process of law, and this court declines to rule in regard to the international unions without a showing that their rights have been preserved.

that all cases under Title 11 shall be referred to the bankruptcy court. By an order dated August 9, 1984, entitled "Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc*" the Chief District Judge of the Southern District of Texas referred all cases under Title 11 to the bankruptcy court.

■ 28 U.S.C. Section 157(b) provides, in pertinent part, that the bankruptcy judge may enter final judgments in core proceedings and can submit proposed findings of fact and conclusions of law to the district court in non-core related proceedings. In 11 U.S.C. Section 1113, Congress has specifically provided for proceedings by debtors to reject collective bargaining agreements. Further, other courts have held that a motion by a debtor to reject an executory contract is a core matter. *See, e.g., In re Chipwich, Inc.,* 54 B.R. 427 (Bankr.S.D.N.Y.1985); *In re Turbowind, Inc.,* 42 B.R. 579 (Bankr.S.D.Cal.1984). None of the parties herein have objected to the jurisdiction of this court over this proceeding. The debtor's motion to reject its collective bargaining agreements is clearly a matter concerning the administration of the estate within the meaning of 28 U.S.C. Section 157(b)(2)(A) and therefore a core proceeding. This court has the power to issue a final order with respect to the debtor's motion to reject its collective bargaining agreements.

Section 1113 of Title 11 and the case law interpreting that section provide the standard by which this court is to be guided in determining whether to allow rejection of a collective bargaining agreement. The court must find that the following elements exist:

1. The debtor-in-possession must make a proposal to the Union to modify the collective bargaining agreement. Section 1113(b)(1)(A).

2. The proposal must be based on the most complete and reliable information available at the time of the proposal. Section 1113(b)(1)(A).

3. The proposed modifications must be necessary to permit the reorganization of the debtor. Section 1113(b)(1)(A).

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably. Section 1113(b)(1)(A).

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal. Section 1113(b)(1)(B).

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union. Section 1113(b)(2).

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement. Section 1113(b)(2).

8. The Union must have refused to accept the proposal without good cause. Section 1113(c)(2).

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement. Section 1113(c)(3).

*In re American Provision Co.,* 44 B.R. 909 (Bankr.D.Minn.1984).

■ The debtor-in-possession, as movant, bears the burden of persuasion by a preponderance of the evidence on all nine elements. *In re Wheeling–Pittsburgh Steel Corp.,* 50 B.R. at 975 (Bankr.W.D.Pa.1985); *In re Salt Creek Freightways,* 47 B.R. 835, 838 (Bankr.D.Wyo.1985); *In re American Provision Co.,* 44 B.R. 907, 909–10 (Bankr. D.Minn.1984). However, the burden of producing evidence does not in all instances rest with the debtor. As stated by another court:

In particular, as to elements [5], [7] and [8], I think that to a certain extent the burden of production of evidence should lie with the Union. As to element [5], I think that it is incumbent upon the debtor in the first instance to show what information it has provided to the Union. It is then incumbent upon the Union to provide evidence that the information provided was not the relevant information which was necessary for it to evaluate the proposal. Likewise as to element

[7], once the debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith. And lastly as to element [8], once the debtor has shown that the Union has refused to accept its proposal the Union must produce evidence that it was not without good cause. Again, once the Union has come forward with evidence on these three elements, the ultimate burden of persuasion on each still lies with the debtor.

*In re American Provision Co.*, 44 B.R. at 909–10.

■ Congress enacted Section 1113 of the Bankruptcy Code in response to the United States Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The statute "adheres to the spirit of [the] unanimous Supreme Court opinion." Statement by the Honorable Orrin G. Hatch on H.R. 5174, 98th Cong.2d Sess. (1984), reprinted in 1984 U.S.Code Cong. & Ad.News 576, 592. The *Bildisco* decision resolved a conflict between the circuits as to the proper standard for rejecting a collective bargaining agreement. The traditional business judgment standard governs the rejection of ordinary executory contracts. *See e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307 (5th Cir.1985). However, collective bargaining agreements have traditionally been accorded a higher status than the normal executory contract. *In re Century Brass Products, Inc.*, 795 F.2d 265 (2d Cir.1986). The special nature of labor contracts is rooted in the national policy which favors collective bargaining in employment, and Congress has strongly cautioned the bankruptcy courts to be considerate of that policy. *International Brotherhood of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1462 (10th Cir.1986).

■ The Supreme Court stated:
Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be presented without a finding that the policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted.

*NLRB v. Bildisco & Bildisco*, 465 U.S. at 527, 104 S.Ct. at 1196. There, the Supreme Court set out that the bankruptcy court must balance the interests of the debtor, creditor, and employees, and the degree and quality of the hardship to each party. It must consider the consequences of liquidation absent rejection. It must consider these equities in light of the debtor's reorganization, the ultimate goal of the Bankruptcy Code. *Id.* With these considerations in mind, this court will now analyze each of the nine elements of Section 1113.

*Element No. 1:* The Debtor Must Make a Proposal to the Union to Modify the Collective Bargaining Agreement

There is no dispute on this point. The debtor made a proposal to Local No. 54 on July 8, 1986, as testified to by Randy Pinter and Mark Pinter on January 16, 1987. The debtor made a proposal to Local No. 2232 on July 14, 1986 and again on August 15, 1986. The unions do not dispute the debtor's contention that the debtor contacted them on numerous occasions in an attempt to negotiate a resolution of the problem.

*Element No. 2:* The Proposal Must be based on the Most Complete and Reliable Information Available at the Time of the Proposal.

■ Local No. 2232 does not address this issue in its brief. Local No. 54, however, asserts that there is no real question as to whether the debtor had, at its disposal, its most recent financial data. There is a substantial question, however, as to whether the wage and benefit package proposed by the debtor was based on complete and reliable information. Local No. 54 further states that Randy and Mark Pinter invented their proposal based on hearsay reports concerning the wage rate paid to non-union sheet metal workers, which they obtained from their customers, competitors and suppliers. Local No. 54 alleges the only firsthand testimony concerning non-union wage rate for sheet metal workers came from Gene Grant who testified on March 12, 1987.

Local No. 54 appears to be arguing that since Grant admitted he did not know the overhead expenses for other employers and since Grant himself fabricates and installs metal duct for heating and air conditioning, which differs from the debtor's more specialized industrial fabrication and installation of sheet metal, Grant's testimony should not be given any weight by this court. However, Local No. 54 does not name any more accurate sources of information from which the debtor could have formed the basis of its proposal. Furthermore, this court cannot engage in speculation as to the sources of information, other than competitors, customers, and suppliers, which the debtor could have used that would have been more reliable. Debtor has sustained its burden of proof on this element.

*Element No. 3:* The Proposed Modifications Must be Necessary to Permit the Reorganization of the Debtor

 This requirement places on the debtor the burden of proving its proposal is made in good faith and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully. As stated by the Court of Appeals for the Second Circuit:

> Thus virtually every case, it becomes impossible to weigh necessary as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health. As the *Royal Composing Room* court phrased it, "A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor."

*Truck Drivers Local 807, International Brotherhood of Teamsters v. Carey Transportation, Inc.,* 816 F.2d 82 at 89–90 (2d Cir.1987) quoting *In re Royal Composing Room, Inc.,* 62 B.R. 403, 418 (Bankr.S. D.N.Y.1986). A more stringent standard for meeting the "necessary" element is found in *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074 (3d Cir.1986). In that case the Court of Appeals held the

legislative history to Section 1113 illuminates two aspects of the court's inquiry into the term necessary: *how* necessary must the proposed modifications be, and (2) the object of the necessary inquiry, i.e. necessary to *what.* As to the first prong, the court concluded that congressional consensus indicates the "necessary" language was substantially the same as the phrasing in Senator Packwood's amendment. That amendment looked to the "minimum modifications ... that would permit the reorganization," requiring "necessary" be construed strictly. This signifies only modifications the trustee is constrained to accept because they are directly related to the company's financial condition and its reorganization. In regard to the second prong, the court again drew from the legislative history, and stated:

> While we do not suggest that the general long-term viability of the Company is not a goal of the debtor's reorganization, it appears from the legislators' remark that they placed the emphasis in determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation, the mirror image of what is "necessary to permit the reorganization of the debtor." This construction finds additional support in the conferees' choice of the words "permit the reorganization" which places the emphasis on the reorganization, rather than on the longer term issue of the debtor's ultimate future.

*Id.* at 1088–89.

The debtor argues that each of its officers, Randy and Mark Pinter, testified on January 16, 1987 that absent relief from the contracts, it cannot survive in the marketplace. The debtor states: "the conclusion is inescapable that TSM's proposal will lower its labor cost, make it far more competitive and permit it to reorganize with hope of future sales." The debtor argues that no measure other than its proposal will allow it to reorganize "given the sheer size of TSM's craft labor cost." Finally, the debtor asserts the evidence shows that the debtor's proposal is the minimum nec-

essary measure in order to permit it to compete in the market.

Local No. 54 responds that the debtor's evidence was too vague, there was no showing of how the $12.56 proposal is necessary to the debtor's reorganization, the only evidence was the Pinter brothers' speculation that a lower wage rate would allow them to be more competitive and get more business, and no specific statistics or projections were produced at the hearing. Further, Local No. 54 asserts there was no testimony at any of the hearings in this matter as to whether, and to what extent, the debtor's profit margin would change if all of the anticipated additional work is acquired. Local No. 54 cites the case of *In re Mile Hi Metal Systems, Inc.* for the proposition that "Congress did not intend, and the statute does not permit, the rejection of labor agreements on a simplistic presentation of a need to reduce labor cost to become more competitive." *In re Mile Hi Metal Systems, Inc.*, 67 B.R. 114, 118 (D.Colo.1986). Local No. 54 argues that the debtor has presented no more than that in the instant case.

Local No. 2232 asserts if other changes are made in the operation of the debtor's business, including despecialization or diversification, the debtor will be able to effectively and successfully reorganize without rejecting the collective bargaining agreements. Local No. 2232 suggests two ways in which the debtor could diversify its business and become more profitable. Under the first alternative, the debtor would utilize the industrial maintenance agreements with the international union, which only applies to renovation or plant maintenance work and not to new construction. This agreement provides for a lower wage rate. Under the second alternative, the debtor would diversify with respect to the class of union workers employed by using apprentices and pre-apprentices to reduce labor costs. Local No. 2232 acknowledges that Mark Pinter testified on January 16, 1987 that the debtor uses journeymen laborers as opposed to apprentice and pre-apprentice workers because "the loss of productivity using a pre-apprentice and apprentice outdoes the cost of using a jour-

neyman and it gets done right the first time." However, Local No. 2232 asserts that Mr. Pinter offered "only that conclusion and no factual evidence to support that conclusion." Finally, Local No. 2232 states if the debtor were to diversify into other areas within the industrial area of the market and bid on contracts for construction at plants other than those solely in the food industry, it would increase productivity without affecting the collective bargaining agreements.

■ After holding six separate hearings on this matter, this court is left with the inescapable conclusion that the debtor's proposal to reduce its labor costs is absolutely necessary to its reorganization. Mark Pinter testified on January 16, 1987, that the reduction of Texas Sheet Metal's labor cost is the most important factor in its ability to reorganize. He also stated that any other changes which the debtor might make in management, in its approach to sales, or any other area, would not be enough to allow the company to reorganize if its labor cost is not also cut. Randy Pinter testified on the same date that he had the George S. May Company, a management consulting firm, conduct a management study of the debtor in 1984 because the company was operating as efficiently as possible. The management firm defined the duties of every employee of the company and showed the Pinters how to streamline the estimating of jobs. The firm also pointed out to the Pinters the company's costs and confirmed that labor is the company's biggest cost. Randy Pinter further testified, based on his eleven years' experience as an estimator and president of the company, the company cannot compete in the marketplace without the proposed reduced labor cost. He supported this statement by adding that the type of work the company engages in is for the most part performed by non-union contractors and that the company cannot pay union wages and make a profit. The court finds his testimony credible.

Debtor's contention that its proposal is necessary to its reorganization is further supported by the testimony of Mr. Gene

Grant, given on March 12, 1987. Mr. Grant is the president and owner of Grant Sheet Metal and has been in the business of fabricating and installing sheet metal duct work for commercial and industrial use since January of 1979. Mr. Grant testified that when his company was in bankruptcy he was granted permission by the bankruptcy court to reject his collective bargaining agreement with the sheet metal union. He wanted to extricate himself from his agreement with the union because the agreement was "putting [him] out of business." Mr. Grant also testified that the "benefits under the union contract are $3.80 or 3.90 an hour which is more that minimum wage. That's killing contractors in my opinion." He stated that, to the best of his knowledge his situation was indicative of the difference between union and non-union companies. Finally, Mr. Grant testified that:

the wage factor that you pay your employees determines whether or not you get the job. If you're having to compete with people that are paying a lesser wage then you are not going to be competitive. If you are having to pay somebody $20.00 an hour that someone else is paying $12.00 an hour, there is no way you can get the job. You cannot compete with an $8.00 higher difference. You have competitive wages.

■ Furthermore, the wage rate proposed by the debtor is probably higher than the prevailing non-union wage rate in the market, as discussed further in the next section. Randy Pinter testified to all of the cost cutting measures taken by the company on March 12, 1987. The company has centralized its purchasing by putting one person in charge, allowing improved comparison shopping. Additionally, the company has reduced its automobile force, allowing its suppliers to deliver, and uses a delivery service, all of which reduces the company's insurance rate plus wear and tear on its vehicles. The monthly rental payment which the debtor pays to its former owner, Randy and Mark Pinters' father, has been reduced by twenty percent from $4,000 per month to $3,200 per month. The company has put all of its supervisors on salaries and reduced the salaries of its office staff by five percent. The Pinters reduced their own salaries by twenty percent. The cost of the debtor's health insurance has been reduced by $1,400 per month. Finally, the company's overhead cost was reduced by approximately $18,000 per month in the two months preceding Randy Pinter's testimony. All of these factors demonstrate the debtor's good faith in making its proposal, tending to show that the company has done all it possibly can do to reorganize. It appears that the only option left for the debtor is to reduce labor costs. A final indicator of the debtor's good faith in making its proposal is Randy Pinter's testimony of March 12, 1987 on direct examination:

Q. Based on your experience and understanding, what has been the historical relationship between Texas Sheet Metal and the unions that its' employees have been members of?

A. It goes back to my dad, who was a sheet metal worker, and when he started his own business he stated the union, and we've been union all these years and had relationships with all of them.

Q. Your father was a member of the sheet metal worker union?

A. Yes, he was. I even was at one time.

Q. To the best of your knowledge, does Texas Sheet Metal have any bias at all in its management with regard to union versus non-union labor?

A. No.

Q. Have y'all ever tried to become a non-union company?

A. No.

Mark Pinter testified on November 10, 1986, that the debtor's labor cost has been so much larger than competitors that for three years the debtor has not been able to compete in the market. He also told the court on January 16, 1987, that because of its labor cost, the company had lost over $600,000 worth of work in the preceding two years. Randy Pinter testified on the same date that the company will not survive if it cannot lower its labor cost. When

questioned by the court as to why the company will not survive, he responded:

Because we—we won't and we haven't been able to acquire the work. All the people—all is the wrong word. The type of work we do is mostly not being done by union contractors. There's very few places in Houston that will work a union contractor, and that is getting fewer and fewer. We have acquired work because people think that we—maybe we won't be union, they're going to let us do work.

Debtor asserts that use of the industrial maintenance agreement is not a feasible method for it to reduce its labor cost. This assertion is borne out by the testimony of Mark Pinter on November 10, 1986 which indicated that the agreement cannot be used for a job that involves new construction. He anticipates over seventy percent of the work the debtor will perform over the course of its reorganization will involve new construction. Mark Pinter also testified that the industrial maintenance agreement cannot be used if there is any other craft working on a job that is not a signatory to the agreement. He projects sixty to seventy percent of the debtor's jobs involve more than one craft.

This court accepts Mark Pinter's testimony. As an officer and part owner of the debtor corporation, he is in the best position to know what Debtor's work involves and whether its work precludes use of the industrial maintenance agreement. Moreover, this court does not accept the suggestion inherent in the argument of Local No. 2232 that the debtor can successfully reorganize without rejecting the collective bargaining agreements by diversification pursuant to its suggestions. Congress has not given this court the authority to tell the debtor how to operate its business. Texas Sheet Metal has been in existence for over thirty years, and the Pinter brothers have extensive experience in running the company. They are in a better position than this court to decide the types of work the debtor should engage in and how to perform such work.

As to the contention of Local No. 54 that the debtor's evidence was "all very sketchy and vague" as to the necessity of the debtor's proposal, this court finds that the testimony and exhibits introduced by the debtor were sufficient to satisfy this court that the debtor's proposal is necessary to its reorganization.

Finally, while it is true that case law states rejection of labor agreements cannot be permitted simply because of a need to reduce labor costs to become more competitive, in this case, the evidence shows reduction of labor costs is the *only* way the debtor will be able to reorganize. Under the circumstances, the debtor proposal meets even the strict standard of "necessary" to reorganization of *Wheeling–Pittsburgh. Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074 (3d Cir.1986). This company appears to be headed directly into liquidation absent relief from its collective bargaining agreements.

*Element No. 4:* The Proposed Modification Must Assure that All Creditors, the Debtor, and All Affected Parties are Treated Fairly and Equitably

The purpose of this requirement is to spread the burden of saving the company to every constituency, while ensuring that all sacrifice to a similar degree. *In re Century Brass Products, Inc.,* 795 F.2d 265, 273 (2d Cir.1986). Congressional intent with regard to the meaning of "fair and equitable" is reflected in the comments of Congressman Morrison, who stated that this language:

[W]ould ensure that, where the trustee seeks to repudiate a collective bargaining agreement, the covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices.

*Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074, 1091 (3d Cir.1986) (quoting 130 Cong.Rec.H. 7496 (daily ed. June 29, 1984)).

Senator Packwood explained the language further:

The second requirement of the proposal —that it assure fair and equitable treatment for all creditors, the debtor and other affected parties ... guarantees that the focus for cost cutting must not be directed exclusively at unionized workers. Rather the burden of sacrifices in the reorganization process will be spread among all affected parties. This consideration is desirable since experience shows that when workers know that they alone are not bearing the sole brunt of the sacrifices, they will agree to shoulder their fair share and in some instances without the necessity for a formal contract rejection.

*Id.* quoting 130 Cong.Rec. § 8898 (daily ed. June 29, 1984).

The debtor is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced but can point to other factors to prove that its proposal is fair and equitable. *Truck Drivers Local 807, International Brotherhood of teamster v. Carey Transportation, Inc.,* 816 F.2d 82, 90 (2d Cir.1987).

The debtor contends its proposal is fair and equitable because it made clear no future wage and benefits cuts would be sought by it. The wage rate it proposed is in the middle range between the prevailing non-union wage rate and the union wage scale. This is due to numerous cutbacks in other areas. Local No. 54 asserts the modifications are patently unfair because the debtor is asking the union workers to take a thirty percent wage and benefit cut while the salaries of office staff have been reduced by only five percent. Local No. 2232 similarly argues it is unfair for the union workers to take a thirty-seven percent wage cut, when the office staff has taken a five percent wage cut. The debtor responded only to the contention of Local No. 54. stating that the union's wage comparison is incorrect. The debtor asserts the correct figures are $16.15 under the debtor's proposal, and $19.92 under the union contract. The debtor states this error was made by comparing the union's total wage and benefits package to the debtor's wage and insurance proposal, without adjustment for social security, state and federal unemployment, worker's compensation and other costs. Therefore, the actual reduction in the wages of union sheet metal workers is 18.92 percent. The reduction in the wages of the Millwright workers union is asserted by the debtor to be a base wage reduction of $1.99 per hour. While the debtor does not set out the percentage wage cut for Millwright Workers of Local No. 2232, the cut would be a smaller percentage than the 18.92 percent wage reduction proposed for the sheet metal workers.

█ This court finds that, under the circumstances, the debtor's proposal is fair and equitable. The rental payment due on the debtor's property has been lowered by the former owner by twenty percent, from $4,000 to $3,200 per month. All office staff and supervisors have taken five percent pay reductions. The Pinters have not had a salary increase since 1980 and have reduced their salaries. Office staff salaries have not increased since some time prior to 1985. Overtime payments for supervisors have been eliminated, and cost cutting measures have been taken in all areas of the debtor's business. The union have not been singled out.

In addition, the wage rate proposed to be paid to the unions is not unreasonable. The debtor proposed to pay the members of both unions $12.56 per hour, with $12.00 per hour as the base wage and $.56 per hour for benefits. This constitutes a $2.83 per hour salary reduction for the members of Local No. 54 and a $1.99 per hour salary reduction for the members of Local No. 2232. Mr. Gene Grant, who testified on March 12, 1987, is a credible witness as to the wage rate for non-union sheet metal workers because of his involvement in numerous city, state and county projects in and around Harris County. On several of the government projects located within Harris County, the job specifications provided for a wage rate of $10.00 to $12.00 per hour. Mr. Grant also testified that sheet metal workers in Harris County can be hired for a minimum of $4.00 an hour

and for "as high as anybody wants to pay them." He stated, however, that the most common range for non-union journeyman sheet metal workers is $8.00 to $9.00 an hour. Mr. Guy Rogers, the business representative of Local 54 who testified on March 13, 1987, conceded he could not contradict anything Mr. Grant said about prevailing wage rates, which appears to be an admission that the non-union wage rate is approximately what Mr. Grant testified. Randy Pinter testified on March 12, 1987, that in formulating the proposal, he picked a wage rate that was higher than that for which he and his brother could hire a skilled worker and still allow the company to be competitive.

Based on the evidence set out above, this court finds the debtor's $12.56 per hour wage and benefits proposal is fair and equitable.

*Element No. 5:* The Debtor Must Provide to the Union Such Relevant Information as is Necessary to Evaluate the Proposal

Neither of the unions dispute that the debtor has met this element. The record contains ample evidence that the debtor made its books available to the unions and explained its proposal to their satisfaction.

*Element No. 6:* Between the Time of the Making of the Proposal and the Time of the Hearing on Approval of the Rejection of the Existing Collective Bargaining Agreement, the Debtor Must Meet at Reasonable Times With the Union

Again, neither of the unions dispute that the debtor agreed to meet at reasonable times with them. Further, there is amply evidence in the record that the debtor made every attempt to meet with both unions, and any reluctance to meet was on their part and not on the part of the debtor. Therefore, this element is satisfied.

*Element No. 7:* At the Meetings, the Debtor Must Confer in Good Faith in Attempting to Reach Mutually Satisfactory Modifications of the Collective Bargaining Agreement

■ This element can be satisfied by establishing that the debtor has seriously

attempted to negotiate reasonable modifications in the union agreements. *In re Kentucky Truck Sales, Inc.,* 52 B.R. 797, 801 (Bankr.W.D.Ky.1985).

■ The debtor asserts it 'fully explained its proposal to the unions, made its books available to them, and sought negotiations through numerous letter requests. The debtor further asserts the unions did not present any evidence that the debtor refused to negotiate from its initial proposal or to consider any counter proposal or suggestion from either union. However, the debtor argues neither failed to engage in substantive negotiations.

Local No. 2232 does not address this issue in its brief. Local No. 54 asserts that the debtor made no further offer after it realized that the union was not receptive to its initial proposal. Local No. 54 claims this is indicative of the debtor's lack of good faith and further shows that there was no causal connection between the wage rate proposed by the debtor and the debtor's reorganization.

The record supports the debtor's position on this element. The debtor sent numerous requests to negotiate with the two unions. The debtor was successful only in obtaining meetings with Local No. 54 on July 8, 1986 and September 5, 1986 and with Local No. 2232 on August 15, 1986. Mark Pinter testified on January 16, 1987, that Local No. 2232 never contacted the debtor to communicate a desire to negotiate. Further, Mr. Guy Rogers, the business representative for Local No. 54, admitted on October 27, 1986, and again on March 13, 1987, that the union had never discussed the possibility of presenting the debtor with a counter-proposal and never intended to do so.

The Second Circuit sheds light on Local No. 2232's argument that the fact the debtor made only one offer is indicative of the debtor's bad faith:

Because the statute requires the debtor to negotiate in good faith over the proposed modifications, an employer who initially proposed truly minimal changes would have no room for good faith nego-

tiating, while one who agreed to any substantive changes would be unable to prove that its initial proposal were minimum. Thus, requiring the debtor to propose bare-minimum modifications at the outset would make it virtually impossible for the debtor to meet its other statutory obligations.

*Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d 82, 89 (2d Cir. 1987). If Local No. 2232 had really been interested in bargaining with the debtor, it would have considered a counter-proposal. Because Local No. 2232 chose not to do so, it cannot now complain of the debtor's failure to make a subsequent proposal.

This courts finds that the debtor bargained in good faith with both unions.

*Element No. 8:* The Union Must Have Refused to Accept the Proposal Without Good Cause

Senator Packard explained that the "good cause" language "serves to prohibit any bad faith conduct by an employer, while at the same time protecting the employer from a union's rejection of the proposal without good cause." *In re Century Brass Products, Inc.,* 795 F.2d 265 (2d Cir.1986) (quoting 130 Cong.Rec. § 8898.) The Second Circuit has held that it is not sufficient to find that because the proposed modifications were necessary, fair and equitable, the union's refusal to accept them was without good cause. Use of that line of reasoning would indicate that the good cause provision adds nothing to the other substantive requirements of the statute. *Carey Transportation, Inc.,* 816 F.2d at 92 (2d Cir.1987). However, the *Carey Transportation* court held that the bankruptcy court ruling that the union neither participated meaningfully in post-petition negotiations nor offered any reason for rejecting the proposal other than its view that the proposed modifications were excessive, justified a finding of lack of good cause on the part of the union. The *Carey Transportation* court found the union's stonewalling tactic was unacceptable and inconsistent with Congressional intent because the good cause requirement was intended to ensure a continuing process of good faith negotia-

tions will take place before court involvement. *Id.*

The debtor repeats the arguments as to the good faith and necessity of its proposal. The debtor also asserts the proposal does not unfairly burden the union workers. The debtor contends, in contrast, Local No. 2232 neither evaluated nor responded to the debtor's proposal, it presented no evidence on the issue, and failed to show that it had any basis for rejection of the proposal. The debtor asserts that as to Local No. 54, its expert witness, Mr. Potter, did not testify after reviewing the debtor's records, and the only person who testified for it, Mr. Guy Rogers, admitted his union seriously considered the debtor's proposal. Finally, the debtor states that if Local No. 54 had good cause for rejecting the proposal, both its accountant, Mr. Potter, and Mr. Rogers could have contradicted the debtor's position.

Local No. 2232 does not address this issue in its brief. Local No. 54 asserts it refused to accept the debtor's proposal because it was based on the debtor's speculation as to what it needed to be competitive and because there was no showing that the proposed wage rate was necessary to permit the debtor's reorganization.

■ The argument of Local No. 54 as to the necessity of the debtor's proposal has already been addressed herein. Clearly, under the standard set out in *Carey Transportation,* the contentions of the unions cannot be sustained this element. Neither union offered any counter-proposal. Mr. Rogers admitted this as to Local No. 54 in testimony on October 27, 1986 and March 13, 1987. Mr. Rogers further stated that the possibility of formulating a counter-proposal was never intended. As to Local No. 2232, Mark Pinter testified on January 16, 1987, that Local No. 2232 never contacted the debtor to communicate its desire to negotiate. The manifest failure of the two unions to participate meaningfully in the post-petition negotiations confirms their lack of justification for rejecting the debtor's proposed modifications. *Carey Transportation,* 816 F.2d at 92 (2d Cir.1987).

*Element No. 9:* The Balance of the Equities Must Clearly Favor Rejection

■ This requirement is a codification of *Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *Carey Transportation,* 816 F.2d at 92 (2d Cir.1987); *Century Brass,* 795 F.2d at 273 (2d Cir.1986); Gibson, *The New Law on Rejection of Collective Bargaining Agreements on Chapter 11: An analysis of 11 U.S.C. § 1113,* 58 Am.Bankr.L.J. 325, 343 (1984). The *Bildisco* court admonished bankruptcy courts to "focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization." *Bildisco,* 465 U.S. at 527, 104 S.Ct. at 1197 (1984). There are at least six permissible equitable considerations, many of which also factor into the other substantive requirements of Section 1113. The six considerations are:

1) the likelihood and consequences of liquidation if rejection is not permitted;

.2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

3) the likelihood and consequences of a strike if the bargaining agreement is voided;

4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees; wages and benefits compare to those of others in the industry; and

6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Bildisco,* 465 U.S. at 525–26, 104 S.Ct. at 1195–96 (1984); *Carey Transportation,* 816 F.2d at 93 (2d Cir.1987); *In re Brada Miller Freight System, Inc.,* 702 F.2d 890, 898–900 (11th Cir.1983); *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698, 707 (2d Cir.1975).

In this regard, the debtor asserts that its union workers will be paid a competitive wage and that the continuation of the agreement will probably cause the debtor to liquidate, thereby removing it as a competitive force in the local economy and eliminating not only the jobs it now creates but also the potential for jobs it could provide in the future. The debtor also points out that neither union has contended that the debtor filed its petition for the sole purpose of escaping liability under the agreements.

Both unions stress the word "clearly" and argue the debtor has not met this test. Further, Local No. 2232 states:

> The motivation for signing a collective bargaining agreement is that such agreements give the signatory company an advantage in bidding with non-signatory companies for Union contract jobs. The Debtor, has been afforded the advantages enjoyed by a signatory company in times of financial and economic prosperity in the market-place. Only after the Debtor has been forced to endure the hardships of the current economic period has it complained of the burden placed upon its operation by the collective bargaining agreements.
>
> The Unions have been forced to endure the economic hardships of the current period also. If the collective bargaining agreements are to be rejected, this will further intensify the hardships the Unions must endure. A great inequity would prevail if the Debtor was permitted to reject the collective bargaining agreements when they present no advantage to the Debtor, after first reaping and enjoying the benefits of those same agreements.

This statement appears to involve two relevant and interesting concessions by Local No. 2232. The first concession it that this is a difficult economic period and the second is that the collective bargaining agreement presents no advantage to the debtor. Both reveal a self-serving intent on the part of Local No. 2232 to preserve its wage and benefit rate at all cost to the debtor, including the debtor's very existence.

As to the first equitable consideration, this court concludes that the debtor is likely to be forced to liquidate if not allowed to reject the collective bargaining agreements. The debtor's principals testified to this at the hearings. The unions have not been able to dispute the rather precarious financial condition of the debtor. If the debtor were to be liquidated, as it pointed out, all of the jobs it currently provides for the individual workers and the local economy, and all the jobs it could provide in the future, would be eliminated. While the debtor made no argument about the effect of liquidation, other than the elimination of jobs, it is safe to assume that the creditors of this estate would receive more under a plan of reorganization than they would if the debtor were liquidated because the going concern value of the business would be preserved.

An estimation of the value of creditors' claims, if the bargaining agreements remain in effect, would be difficult for this court to make because little or no evidence was presented at the hearings on claims of creditors. However, the estate appears to have at least two creditors, Allied Bank, for whom the debtor borrowed some $200,-000 for operating funds, and the former owner of the business, Ben Pinter. Assumedly, the value of these creditors' claims would be reduced if the agreements remain in effect, if for no other reason than the debtor's lack of sufficient funds to pay these creditors.

As to the third equitable consideration, no party mentioned the possibility of a strike if the agreements are voided. Therefore, this court finds it is not a likelihood.

However, it is quite likely that the union workers will have claims for breach of contract if rejection is approved. The rejection of any executory contract constitutes a breach of that contract under 11 U.S.C. Section 365(g). The breach relates back to the date immediately preceding filing of the bankruptcy petition. The Supreme Court took note of these consequences of rejection in *Bildisco*, 465 U.S. at 530 N. 11–12, 104 S.Ct. at 1198; *See IML Freight, Inc.*, 789 F.2d at 1463 (10th Cir. 1986). Moreover, some of those claims may be entitled to priority in payment. *See* 11 U.S.C. Section 507. Accordingly, union workers have a better chance of being paid for the loss occasioned by rejection of the collective bargaining agreement than do the creditors and the debtor's other employees.[2]

The fifth and sixth equitable considerations have already been discussed in previous sections of this memorandum and there is no need to comment on them any further. It appears the debtor did not file its Chapter 11 petition solely to avoid the collective bargaining agreements. The equities of this situation clearly favor the debtor. The saving grace for the unions is the debtor's continued duty to bargain in good faith towards achieving a new contract with the unions. *In re Salt Creek Freightways*, 47 B.R. at 841–42, (Bankr.D.Wyo. 1985).

## EFFECTIVE DATE

The effective date of rejection of the contracts is a second issue to be determined, according to the debtor. The debtor argues that, through no fault of its own, it was unable to obtain meaningful negotia-

---

**2.** The court finds the reasoning in the *Salt Creek Freightways* case persuasive on this point:

Thus, it appears that, if the contract is rejected, the union employees will be in a better position that the other non-contractual employees of the debtor because they may receive dividends based on unsecured claims for the damages resulting from the court-approved rejection of the collective bargaining agreement. Because the non-union employees of the debtor are not working under a contract, they would have no similar unsecured claims based upon the debtor's unilater-

al reductions of their wages and benefits. Additionally, under § 507(a)(3) and (4), unsecured claims made by workers to cover benefits such as pensions plan obligations are granted a certain priority over the claims of other unsecured creditors. Accordingly, from an equitable standpoint, it appears that the union employees are not being made to bear a disproportionate share in the debtor's reorganization efforts.

*In re Salt Creek Freightways*, 47 B.R. at 841–42 (Bankr.D.Wyo.1985).

tions with the unions at any time after it delivered its proposals. The debtor also claims this matter has been delayed for many months by the court's scheduling difficulties. It states that if rejection of the agreements is effective only prospectively from the date this court gives it ruling, the debtor's reorganization could be seriously prejudiced. Therefore, the debtor asks this court to set a date for rejection well prior to commencement of testimony on these applications, in order to remove any influence by this court's busy schedule on the practical outcome of this matter. The debtor also requests the court recognize the failure of the unions to negotiate. Specifically, the debtor asserts that the proper date for rejection to become effective is September 1, 1986. The debtor relies on *In re Mile Hi Metal Systems, Inc.*, 67 B.R. 114 (D.Colo.1986), for the proposition that the court is authorized to permit rejection on any date after the debtor made its initial proposal to the unions.

*Mile Hi Metal Systems, Inc.*, 67 B.R. 114 (D.Colo.1986), does not provide support for the relief requested by the debtor. There, the court analyzed the legislative history of Section 1113 and concluded that the debtor's proposal defines the parameters of any relief the court may subsequently grant the debtor. The debtor's proposal was found not to contemplate a retroactive application from the date of the court's decision, since it was submitted as a proposal for *immediate* permanent modification of the collective bargaining agreement. *Immediate* was determined to mean relating to the here and now.

However, in that case the court was able to rule on the debtor's motion to reject much more quickly than this court.[3] Further, this court is mindful of the evidence at the hearings and the debtor's statement as to its precarious financial condition. Therefore, Debtor's rejection of its collective bargaining agreement is effective as of the date of this order.

---

**3.** The delays in this case were not caused solely by this court's overcrowded docket. There was a substantive delay in the submission of post-tri-

## CONCLUSION

Texas Sheet Metals has met the elements of 11 U.S.C. Section 1113 by a preponderance of the evidence. In order to reorganize, the debtor must be allowed to reject the collective bargaining agreements. This court has a limited statutory role in the bargaining process, and therefore, the parties are encouraged to continue to bargain on their own. For the reasons set out above, a separate order will issue granting the relief requested in the debtor's motion to reject its collective bargaining agreement.

al briefs. Further, the parties had to reproduce the exhibits causing further delay.